STACY A. COFFEY, NOW KNOWN AS STACY A. RYAN, APPELLANT
AND CROSS-APPELLEE, V. J. MICHAEL COFFEY,
APPELLEE AND CROSS-APPELLANT.
661 N.W.2d 327

Filed May 13, 2003.    No. A-02-051.

Kathleen K. Rockey, of Copple, Rockey & McGough, P.C., and William G. Dittrick, of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, L.L.P., for appellant.

John S. Slowiaczek and Virginia A. Albers, of Lieben, Whitted, Houghton, Slowiaczek & Cavanagh, P.C., L.L.O., for appellee.

SIEVERS, INBODY, and MOORE, Judges.

MOORE, Judge.

## I. INTRODUCTION

Stacy A. Coffey, now known as Stacy A. Ryan, appeals from an order by the district court for Douglas County, which terminated the joint custody arrangement in the decree of dissolution and awarded custody of the parties' minor children to J. Michael Coffey, subject to Stacy's specific visitation. Stacy asserts error to the award of custody, visitation, and child support; the assignment of bank accounts held for the benefit of the children; and orders sealing the court file. In Michael's cross-appeal, he assigns error with regard to fees for his own attorneys and fees for the guardian ad litem (GAL) and the GAL's attorney.

## II. BACKGROUND

The parties were married on April 19, 1985, and divorced on November 24, 1997. Four children, Megan, John Ryan (Ryan), and twins Sean and Timothy were born to the marriage on November 14, 1987, February 23, 1989, and June 5, 1991, respectively. The parties were granted joint shared custody of the children, pursuant to their settlement agreement as approved by the district court. The decree provided that the parties would agree to the amount of time spent between the two homes, but it was contemplated that the children would spend approximately 60 percent of their time with Stacy and 40 percent with Michael. Michael was to have possession of the children from Wednesday,

after school or early Wednesday morning when the children were not in school, until Friday morning, when the children would return to school or to Stacy's home when not in school. Michael was also to have the children every other week on Friday until a reasonable time on Sunday afternoon or early Sunday evening. The parties agreed to split possession of the children during the summer so that each party had the children for approximately 50 percent of the time. At the time of the modification trial, Megan was 14, Ryan was 12, and the twins were 10 years old. Megan and the twins were attending a parochial school, while Ryan, who has learning disabilities, was attending a private school. Because of those disabilities, Ryan requires extra assistance from his teachers at school and from his parents at home in order to complete his homework assignments, and he benefits from structure and consistency in his daily routine. Subsequent to the entry of the decree, the parties agreed to allow Ryan to go home with Stacy on Wednesday and Thursday after school to facilitate consistency in Ryan's environment for completing his homework. Stacy then returns Ryan to Michael's home on Wednesday and Thursday evenings.

The record reflects that the joint custody arrangement deteriorated between the time of the decree and the filing of Stacy's application for modification. The parties have had repeated difficulty in communicating with one another over issues, including scheduling doctor's appointments, funding a joint account provided for in the decree and used for payment of the children's expenses, supervision and completion of the children's homework assignments, and other issues related to the children's basic needs. The record is replete with various faxed and written communications between the parties on these and other issues, illustrating the deterioration of their ability to cooperate amicably toward resolution of these issues. The record shows that at least some of the children's grades suffered during this period, and the evidence suggests that the midweek transfer of the children between the parties' residences has made it more difficult for the children to keep track of homework assignments and personal items.

The child support provision in the decree reflected the parties' agreement to deviate from the Nebraska Child Support Guidelines. The parties agreed to establish a joint checking

account with an initial contribution of $1,000 each, and thereafter, Stacy was to deposit $600 per month and Michael was to deposit $1,200 per month. Either party was allowed to pay child-related expenses, as specified in the decree, from the account. Each year, during the month of August, the parties were to review with each other the expenses for the year to determine whether the amounts being contributed were sufficient to cover the children's expenses.

At the time of the divorce decree, Michael was employed as an attorney, and he subsequently became a district court judge. Michael's gross monthly income at the time of the modification trial was approximately $8,556, and his net monthly income was approximately $5,407. Michael's income tax returns for 1998, 1999, and 2000 showed adjusted gross income of $70,904, $76,548, and $91,676, respectively.

Stacy was not employed outside the home at the time of the modification trial. Stacy was employed full time in pharmaceutical sales in 1997. In 1998, she took part-time contracts to be more flexible for the children and worked approximately 25 to 30 hours per week in 1998, 1999, and 2000. In 2001, Stacy became employed by a different company in the area of pharmaceutical sales. Stacy indicated that her contract with that company ended in late April 2001 and that she has not obtained another contract since that time. Stacy testified that her parents are willing to help her financially if she has custody of the children.

In the divorce decree, Stacy was awarded, as separate premarital or nonmarital property, her interest in Streck Laboratories (Streck Labs), which interest was 1,100 shares valued at approximately $250,000, and her interest in the Ryan Family Limited Partnership (family partnership), which interest was valued at $25,000. Streck Labs is a subchapter S corporation wholly owned by Stacy's family. The divorce decree indicated it was anticipated that the family partnership would begin providing Stacy annual income in approximately 8 years. In late December 1997, Stacy received a distribution from Streck Labs in the approximate amount of $90,000. For the years 1998, 1999, and 2000, Stacy's tax returns show passive income from both Streck Labs and the family partnership. Stacy's adjusted gross income for 1998, 1999, and 2000 was $150,627, $170,326, and $55,954, respectively.

Stacy filed a petition to modify the decree of dissolution on March 21, 2001, requesting sole custody of the parties' children, subject to visitation by Michael. In Stacy's petition, she alleged that a material change in circumstances had occurred since the entry of the decree, which change materially affected the best interests of the parties' children. Stacy's petition to modify was in excess of 20 pages in length and was amended on two occasions during the course of these proceedings. We will not repeat the specific allegations of her petitions here, except to state Stacy alleged that Michael had repeatedly violated the terms of the parenting plan contained in the decree, that Michael had been unable to cooperate with her sufficiently to make the joint custody arrangement work, that Michael's conduct had interfered with Stacy's ability to effectively parent the children, and that Michael's failure to abide by the terms of the parenting plan had negatively impacted Stacy's relationship with the parties' children and had been detrimental to the children's best interests. Michael filed a responsive pleading and cross-petition, in which he denied that a material change in circumstances had occurred but sought sole custody of the parties' children in the event that the court determined that such a change had occurred. A GAL was appointed for the children. The parties' petitions to modify were heard by the court on November 26 through 30. Other procedural and factual matters relevant to the resolution of this appeal will be recited below as necessary.

The district court entered an order of modification on December 12, 2001, finding that a material change in circumstances had occurred which necessitated termination of the joint custody arrangement and parenting plan set forth in the decree. The court found that the joint and shared custody arrangement and corresponding parenting plan established by the parties had failed. The court stated that the evidence showed that the parties had been unable to agree on or resolve many of the most basic parenting matters relating to the children, including schooling, transportation, time spent by the parties with the children, and the children's activities. The court found that while there generally had been communication between the parties, most of that communication had been negative and often impersonal through

the use of written correspondence and facsimiles. The court found that there had been a lack of trust between the parties, as exemplified by Stacy's engaging private investigators to conduct surveillance of Michael and by Michael's tape-recording telephone conversations with Stacy despite her expressed wishes to the contrary. The court further found that the children had not benefited from being shuttled between two households in the same community without having a primary residence. The court determined that this arrangement was not in the children's best interests because of the parties' inability to make the parenting plan work.

After determining that a material change in circumstances had occurred, the district court reviewed the considerations of Neb. Rev. Stat. § 42-364(2) (Reissue 1998) and made specific findings with respect to those considerations. The court determined that both parties had maintained a good relationship with the minor children subsequent to the decree of dissolution, and that thus, the parties' relationships with the children was not a factor favoring one parent over the other. The court noted that none of the children testified or were interviewed by the court. Accordingly, the court did not make any finding as to the wishes and desires of the children. The court found that the children thrived in both households such that the children's general health, welfare, and social behavior were not factors favoring one parent over the other. The court found no evidence of abuse and concluded that other factors, such as the parties' moral fitness and sexual conduct, were not issues.

The district court found that while both parents were fit and proper persons to have custody of the minor children, the children's best interests would be served by awarding their custody to Michael, subject to reasonable rights of visitation in Stacy. The court noted that while both parties maintained structured and disciplined homes, the evidence suggested that Michael was the more flexible of the two parents. The court found that Michael had not sought to control the way in which parenting was performed by Stacy, while the converse had not been true. The court further found that Michael would be more likely to continue this flexibility with regard to Stacy's visitation and was thus better suited to have custody. With regard to visitation, the

district court found that visitation should be as determined by the parties, but the court set forth a detailed visitation schedule covering weekends, holidays, summers, mail and telephone contact, and other general provisions in the event the parties could not agree.

The district court ordered Stacy to pay child support, commencing January 2, 2002, in the sum of $1,466 per month while she is obligated to support four children, with corresponding reductions as her obligation terminates for each child. The court attached to the order of modification the court's worksheets showing the basic income and support calculations. The court also ordered, among other things, that each party should pay his or her own attorney fees and costs, except Stacy should contribute $2,500 toward the attorney fees and costs incurred by Michael in defense of Stacy's motion to disqualify Michael's counsel and the children's GAL, and that the fees and costs of the GAL and the GAL's attorney should be divided equally between the parties. Additional details of the order of modification are discussed below as necessary.

### III. ASSIGNMENTS OF ERROR

Stacy asserts, restated, that the trial court erred in (1) failing to award custody to her, (2) accepting opinion testimony from the GAL, (3) entering its order with regard to augmented visitation, (4) calculating child support, (5) ordering Stacy to give Michael property previously awarded to her in the decree of dissolution, and (6) entering an order sealing the file and preventing only Stacy from disseminating pleadings and information.

On cross-appeal, Michael asserts, restated, that the district court erred in (1) failing to require Stacy to compensate him in full for the attorney fees and costs incurred in defending this action and (2) dividing the fees and costs for the GAL and the GAL's attorney equally between the parties.

### IV. STANDARD OF REVIEW

Child custody determinations, and visitation determinations, are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647

N.W.2d 577 (2002). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Id.* In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *McGuire v. McGuire*, 11 Neb. App. 433, 652 N.W.2d 293 (2002). However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

An appellate court's review of the trial court's admission or exclusion of expert testimony which is otherwise relevant will be for an abuse of discretion. *Kirchner v. Wilson*, 262 Neb. 607, 634 N.W.2d 760 (2001).

Modification of child support payments is entrusted to the trial court's discretion, and although, on appeal, the issue is reviewed de novo on the record, the decision of the trial court will be affirmed absent an abuse of discretion. *Crawford v. Crawford*, 263 Neb. 37, 638 N.W.2d 505 (2002).

In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Bowers v. Lens*, 264 Neb. 465, 648 N.W.2d 294 (2002). Likewise, the allowance, amount, and allocation of a GAL fee are matters within the initial discretion of the trial court, necessarily involve consideration of the equities and circumstances of each particular case, and will be set aside on appeal only when there appears to be an abuse of discretion by the trial court. *Halouska v. Halouska*, 7 Neb. App. 730, 585 N.W.2d 490 (1998).

## V. ANALYSIS

### 1. CUSTODY

Stacy asserts that the trial court erred in failing to award sole custody of the parties' children to her. She further asserts that

the district court (1) erred in basing its decision on a nonrecognized "flexibility standard"; (2) failed to apply the standards set forth in § 42-364(2) and *Davidson v. Davidson*, 254 Neb. 357, 576 N.W.2d 779 (1998); and (3) failed, despite a written request, to make specific findings of fact and conclusions of law regarding the issue of custody.

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Tremain v. Tremain*, 264 Neb. 328, 646 N.W.2d 661 (2002). Neither party claims that the other is unfit, and the record shows that Stacy and Michael are both good and fit parents, albeit with different parenting styles. However, their inability or unwillingness to execute those duties jointly leads to the result that one or the other must be given primary responsibility for the children's care. See *Robertson v. Robertson*, 217 Neb. 786, 350 N.W.2d 576 (1984). Accordingly, we turn to an analysis of whether the trial court correctly determined that it is in the children's best interests to be placed in Michael's sole custody.

Section 42-364(2) provides:

In determining custody arrangements and the time to be spent with each parent, the court shall consider the best interests of the minor child which shall include, but not be limited to:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child if of an age of comprehension regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child; and

(d) Credible evidence of abuse inflicted on any family or household member.

In determining a child's best interests under § 42-364, courts may consider factors such as general considerations of moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional

relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; parental capacity to provide physical care and satisfy educational needs of the child; the child's preferential desire regarding custody if the child is of sufficient age of comprehension regardless of chronological age, and when such child's preference for custody is based on sound reasons; and the general health, welfare, and social behavior of the child. *Davidson v. Davidson, supra.*

Stacy's assertion that the district court did not issue specific findings of fact and conclusions of law with regard to custody, despite her request to do so pursuant to Neb. Rev. Stat. § 25-1127 (Reissue 1995), is without merit. The district court entered a nine-page order of modification detailing its findings of fact and conclusions of law with regard to the matters at issue. Its findings and conclusions with regard to custody are outlined above in the background section of this opinion.

Likewise, the district court did not create a new "flexibility standard" in awarding custody to Michael. Stacy complains of the portion of the order finding that while both parties maintain structured and disciplined homes, Michael is the more flexible of the two parents; that Michael has not sought to control the way in which parenting is performed by Stacy; and that Michael would be more likely to continue this flexibility with regard to Stacy's visitation. In so finding, the district court was not creating a new standard for modification of custody, but, rather, it was making findings of fact based upon the record before it, just as Stacy had requested the court to do. When read in the context of the entire portion of the order of modification dealing with custody, it is clear that the parties' relative flexibility was simply one of many factors considered by the district court in making its decision with respect to custody. Further, it is appropriate to consider which parent would better promote visitation and a positive relationship between the children and the other parent. See *Hibbard v. Hibbard*, 230 Neb. 364, 431 N.W.2d 637 (1988) (recognizing that visitation is key ingredient of raising children and that it is in children's best interests to be with their respective parents to utmost). Stacy's argument is without merit.

Finally, the district court did not fail to apply the relevant case law and statutory standards. With regard to § 42-364(2), the district court found that both parties had maintained a good relationship with the minor children subsequent to the decree of dissolution and that the children thrived in both households. The district court found that these two factors did not favor one parent over the other. There was no evidence of abuse or testimony from the children as to their desires and wishes. The district court also found that factors such as the parties' moral fitness and sexual conduct were not issues. The parties are clearly contentious and each has numerous complaints about the other; however, based upon our de novo review of the record and the various statutory and case law factors, we cannot say that the trial court abused its discretion in finding that a material change in circumstances had occurred and in awarding custody of the parties' children to Michael.

### 2. GAL Testimony

Stacy asserts that the court erred in receiving custody opinions from the GAL based on hearsay, bias, and lack of foundation, and in overruling the parties' separate motions filed under Neb. Ct. R. of Discovery 35 (rev. 2001) for custody evaluations. We note that the GAL was first called to testify by Stacy as an adverse witness in this case and that her attorney questioned the GAL extensively about his report, much of which was based on hearsay by the GAL's own admission. During cross-examination and over Stacy's foundational objection, the GAL was allowed to testify that both parents were fit but that the children "would be better with their father."

With regard to the role of a GAL, the Nebraska Supreme Court has stated:

> A court, under its inherent equitable powers, may appoint a [GAL]. A [GAL] may or may not be an attorney. The [GAL]'s duties are to investigate the facts and learn where the welfare of his or her ward lies and to report these facts to the appointing court. These reports to the court, whether in written form or testimony by the [GAL], including hearsay, shall be subject to the Nebraska rules of evidence.

*Betz v. Betz*, 254 Neb. 341, 345, 575 N.W.2d 406, 409 (1998).

We first address Stacy's hearsay argument. Stacy's hearsay objection to the offer of the GAL's written report was sustained by the trial court. Stacy objected to the "custody opinion" testimony given by the GAL based on lack of foundation rather than hearsay. Because Stacy did not object to this particular testimony based on hearsay, she cannot now complain about the GAL's "custody opinion" testimony based on hearsay. One may not on appeal assert a different ground for excluding evidence than was urged in the objection made to the trial court. *Benzel v. Keller Indus.*, 253 Neb. 20, 567 N.W.2d 552 (1997). Where the grounds specified for the objection at trial are different from the grounds advanced on appeal, nothing has been preserved for an appellate court to review. *Id.* Stacy did make hearsay objections to a few questions asked of the GAL on cross-examination other than those designed to elicit hearsay testimony. However, much of the testimony elicited from the GAL on cross-examination covered the same areas of testimony covered by Stacy's counsel on direct examination of the GAL. Stacy cannot now complain of the GAL's testimony on cross-examination to the extent that she "invited" this error by her direct examination of the GAL. A party cannot complain of error which that party has invited the court to commit. *Medlock v. Medlock*, 263 Neb. 666, 642 N.W.2d 113 (2002).

As to Stacy's argument concerning the alleged bias of the GAL in reaching his opinion, this argument does not appear to be based on any evidentiary rule, but, rather, it goes to the credibility of the GAL, a determination of which we defer to the trial court. An appellate court defers to the lower court's assessment of the weight and credibility of the evidence because the lower court has the advantage of hearing the witnesses and observing important factors of testimony not readily apparent in a cold record. *In re Estate of Brionez*, 8 Neb. App. 913, 603 N.W.2d 688 (2000).

We next consider the issue of the foundation for the GAL's "custody opinion" testimony. We question whether an attorney appointed to act as a GAL in a dissolution proceeding has the appropriate training to render an "expert" opinion on custody. Concerning this issue, one commentator has stated:

In custody cases, courts often ask those performing the role of [GAL] to render expert opinions even though they do not have the requisite training to do so. It is assumed that they can make such a recommendation merely because they have done an investigation at the request of the court. In effect they are imbued with expertise, merely by virtue of having been placed in that role, irrespective of their actual background. This fictional qualification as a child custody expert then becomes self-perpetuating. The more often a particular individual performs that role, the more likely that the trial court will rely on him [or her] as if he [or she] were an expert.

The judiciary and the general public assume lawyers are competent to render such an opinion in the role of a [GAL] simply because of their experience representing dissolution clients. This logic is akin to assuming that an attorney who has handled a number of soft tissue injury suits would be qualifiable as an expert on soft tissue injuries. . . .

Many reasons exist for judges, lawyers, counselors, and others who deal regularly with children to have some specialized training regarding issues like child development, parenting, and the effects of legal disputes on children. However, participation in such training does not make them experts. Those who are experts in the field of child psychology or child development generally limit their expertise to the specifics of their training and experience. Rarely is someone competent to render an expert opinion on which parent's custody is in the best interest of the child.

Raven C. Lidman and Betsy R. Hollingsworth, *The Guardian Ad Litem in Child Custody Cases: The Contours of Our Judicial System Stretched Beyond Recognition*, 6 Geo. Mason L. Rev. 255, 276-77 (1998).

In the present case, we need not determine the question of the admissibility of the GAL's custody opinions, as there is other evidence in the record to support the trial court's ruling as to custody. In a trial to the court, the presumption is that the trial court considered only such evidence as is competent and relevant, and the reviewing court will not reverse such a case because evidence was erroneously admitted where there is other material,

competent, and relevant evidence sufficient to sustain the judgment. *In re Interest of Kelley D. & Heather D.*, 256 Neb. 465, 590 N.W.2d 392 (1999). Upon a de novo review in an appellate court, incompetent, irrelevant, and immaterial evidence offered in the original trial, which was admitted over proper objections by the adverse party, will be disregarded. *Smith v. Smith*, 9 Neb. App. 975, 623 N.W.2d 705 (2001). Assuming without deciding, as did the court in *Smith v. Smith, supra*, that some of the GAL's opinion testimony may contain evidence that is inadmissible, we have disregarded such evidence in our de novo review of the record. Therefore, this assigned error is without merit.

Stacy asserts that the trial court should have granted the parties' separate motions for custody evaluations pursuant to rule 35 and that the court should have granted her motion for an alcohol evaluation. Stacy asserts that at a minimum, the GAL should have been permitted to hire a licensed child psychologist to render a custody evaluation. The granting or denying of a motion to compel a physical or mental examination of a party is grounded in the discretion of the trial court; absent an abuse of that discretion, the trial court's ruling must stand. *Thynne v. City of Omaha*, 217 Neb. 654, 351 N.W.2d 54 (1984).

We note that Stacy opposed Michael's motion for a rule 35 evaluation. We further note that the denial of Stacy's motion did not preclude her from seeking the assistance of mental health professionals to conduct evaluations of herself and the children and from offering the results of any such evaluations at trial. In fact, one of the parties' children was in counseling at the time of trial, and that therapist was called as a witness on Stacy's behalf. We also note that the court's denial of Stacy's motion for an alcohol evaluation did not preclude Stacy from further investigating this issue. The record before us shows that Stacy hired a private investigator to observe Michael's use of alcohol and that she presented evidence of that investigation and other evidence on this issue at trial. While a custody evaluation by a qualified mental health practitioner may have been more useful than a GAL, there was more than sufficient evidence to consider for the trial court to make its determination of custody. The district court did not abuse its discretion in overruling the parties' motions for rule 35 custody evaluations or in overruling Stacy's motion for an alcohol evaluation.

### 3. VISITATION

Stacy asserts that the district court erred in setting visitation in the order of modification and, in particular, by granting Michael discretion to determine "augmented visitation." In its order of modification, the district court stated that "[r]easonable visitation shall be as determined between the parties, but in the event they cannot agree, the visitation shall include, but not be limited to, the following . . . ." Thereafter, the court set forth a detailed visitation schedule covering weekends, holidays, summers, mail and telephone contact, and other general provisions. Stacy complains in particular of subparagraph F6 of the general visitation provisions, which states as follows:

The specific visitation for the non-custodial parent set forth in this Order shall not be construed by either party as the only parenting time the non-custodial parent may have with the minor child or children. The custodial parent has the affirmative obligation to cooperate with the non-custodial parent in arranging additional parenting time with the children as is in the best interests of the children.

Stacy argues that by the above provisions, the district court granted Michael sole discretion as to how the extended visitation is to occur. Stacy further argues that the district court abdicated its "solemn duty to determine visitation in the best interests of the children; a duty which cannot be delegated to either of the parties or superseded or forestalled by their agreements." Reply brief for appellant at 10.

While it is true that that visitation rights should not be at the sole discretion of the custodial parent, we do not read subparagraph F6 as giving Michael the sole discretion to determine extended visitation. There will clearly be times beyond those specified in the order when Stacy will want to spend time with the children for special occasions, such as extended family functions. These are not things that can be anticipated in advance or mandated by court order. In the order of modification, the district court, rather than delegating part of its judicial duty, was merely identifying that such circumstances would occur and reminding Michael that he has a duty to cooperate with Stacy in arranging such off-schedule visitations in keeping with the best interests of the children. Although subparagraph F6 identifies this duty of

cooperation only with respect to Michael, we would add that Stacy has such a duty to cooperate with Michael as well, given that special events that either parent desires to participate in with the children could just as easily occur during times when the children are to be with Stacy as during the times when they are to be with Michael. The district court did not abuse its discretion in setting visitation. Stacy's arguments regarding the inclusion of subparagraph F6 in the order of modification are without merit.

### 4. Child Support

In computing Stacy's income for purposes of setting child support, the district court utilized the adjusted gross income figures from Stacy's tax returns for the years 1998 through 2000. Stacy argues that the district court erred in computing child support in the following respects: including the allocated but undistributed passive income from Streck Labs and the family partnership, including monetary gifts that she received from her parents, including alimony she received, and utilizing a 3-year average. We shall address each argument separately.

### (a) Passive Income

The record shows that Stacy has a 1.093874-percent ownership interest in Streck Labs and that her ownership interest in the family partnership is approximately 20 percent for profit-and-loss sharing and 1 percent for her ownership of capital. Stacy testified, in response to questioning about her receipt of income from Streck Labs, that her tax returns reflect subchapter S corporation income that she does not receive. According to Stacy, the money she does receive from Streck Labs is used to pay her quarterly tax estimates. With regard to the $90,000 that Stacy received from Streck Labs in 1997, Stacy indicated that this was a "one-time" distribution. Stacy indicated that she did not have any control over distributions from Streck Labs and the family partnership, that she never knew if she was getting a distribution, and that sometimes she did not receive a distribution. She also indicated that she did not receive any distributions from the family partnership beyond the tax liability for 1999 or 2000.

Bradley Focht, an accountant, testified on Stacy's behalf and indicated that he assisted Stacy in preparing her "[s]elf-prepared" tax returns for the years 1998 through 2000. Focht identified

Stacy's income from Streck Labs and the family partnership represented on schedule E of her income tax returns as "non-cash income" that Stacy was taxed for, because owners of subchapter S corporations and limited partnerships, unlike owners of "C corporation[s]," are taxed directly for the earnings of those entities. Focht further explained that with a subchapter S corporation, "the income is taxed directly to the shareholders, so any dividends that might be distributed or any distributions that might be received are not taxed because they have already been taxed at the sub chapter S level directly to them." Focht testified that Stacy did not receive money from Streck Labs for the tax years at issue in the amounts represented under her schedule E income. Focht testified that Stacy did receive money from both Streck Labs and the family partnership during these years, which money is a distribution to cover her share of the taxes, both federal and state, for each of these entities.

Stacy's tax returns indicate that in 1998, she had passive income of $53,604 from Streck Labs, passive income of $47,466 from the family partnership, and estimated federal tax payments of $40,601; that in 1999, she had passive income of $65,043 from Streck Labs, passive income of $54,005 from the family partnership, and estimated federal tax payments of $46,323; and that in 2000, she had passive income of $86,220 from Streck Labs, passive loss of $73,843 from the family partnership, and estimated federal tax payments of $31,741. Focht testified that these estimated tax payments were made from moneys that Stacy received from either Streck Labs or the family partnership to pay her tax liability on a quarterly basis. According to Focht, these distributions are not taxable, since the money has already been included in the income of Streck Labs and the family partnership, for which income Stacy has already been taxed.

Nebraska has not directly addressed the question of whether passive income such as exists in this case should be considered as income for purposes of setting child support. Therefore, we turn to a review of cases from other jurisdictions that have addressed this issue. We first note the following commentary:

> One disadvantage of [s]ubchapter S election is shareholders must pay income tax on corporate earnings regardless of whether they receive a dividend. S corporation income is

included in shareholders' gross income even when an S corporation does not distribute earnings. Because an S corporation's earnings are included in the gross income of its shareholders for tax purposes, some courts treat the earnings as gross income for child support purposes as well. Courts are split on the issue of whether to consider S corporation earnings in calculating child support payments.

M. Kyle Rominger, Note, *Valuing S Corporation Earnings in Child Support Calculations*, 35 U. Louisville J. Fam. L. 145, 146 (1996).

The Kansas Supreme Court, in *In re Marriage of Brand*, 273 Kan. 346, 44 P.3d 321 (2002), discussed subchapter S corporation income in relation to a mother's motion to modify child support seeking to have included as income for purposes of calculating child support the father's distributions received from several subchapter S corporations in which he was a minority shareholder. The father in that case did not receive any distributions, either during or after the marriage, in excess of his tax obligations from any of the relevant entities, that would have been available to share with his ex-wife or children. The majority owners of the relevant entities did not expect future distribution amounts to be more than the amount needed by each individual shareholder to cover his or her share of the business' taxes. In that case, the district court held that such distributions were not income "received" under the Kansas Child Support Guidelines. In considering the issue on appeal, the Kansas Supreme Court outlined the tax treatment of subchapter S corporations and stated:

> Although a [s]ubchapter S corporation may distribute income, it is not required to do so. [Citation omitted.] Earnings are owned by the corporation, not by the shareholders. [Citation omitted.] Subchapter S corporations may accumulate profits, referred to as "retained earnings." Retained earnings are the net sum of a corporation's yearly profits and losses. [Citation omitted.]
>
> Subchapter S status provides an alternate method of taxing a corporation's income. [Citation omitted.] In a [s]ubchapter S corporation, income tax is paid by the shareholders rather than by the corporation itself. [Citation omitted.]

When the tax is paid by the individual, the corporation avoids income tax liability. [Citation omitted.]

A [s]ubchapter S corporation allocates various items of income to shareholders based upon the shareholder's proportionate ownership of stock. [Citation omitted.] Allocations are itemized on an individual shareholder's Schedule K-1. [Citation omitted.]

*In re Marriage of Brand*, 273 Kan. at 351, 44 P.3d at 325.

The mother in *In re Marriage of Brand* asserted that the district court erred by not including the father's subchapter S corporations' income or distributions in calculating child support and argued that the definition of income in the Kansas Child Support Guidelines was broad enough to include distributions made by subchapter S corporations to shareholders. The father asserted that the amounts at issue should not be treated as income because they were never financially available to the family and because as a minority shareholder, he had no ability to control the amounts distributed. The Kansas Supreme Court concluded both that there was no presumption that an individual's share of a subchapter S corporation's income should be included as income for purposes of calculating child support and that inquiry would be necessary on a case-by-case basis. The court further noted that while the broad wording of the Kansas Child Support Guidelines could be interpreted to include subchapter S corporation earnings or distributions in the definition of gross income, under the circumstances demonstrated in that particular case, it would be inappropriate to include them for purposes of determining the proper amount of support. In other words, the Kansas Supreme Court refused to set a bright-line or blanket rule applicable to all cases. The court also noted that there are many factors to be considered when determining what amount of a subchapter S corporation's income should be included as income for purposes of calculating child support, including past earnings history of the corporation, ownership share, and the shareholder's ability to control distribution, with heightened scrutiny being given to cases where income can be manipulated due to the ability to control distributions. Under the facts presented in *In re Marriage of Brand, supra*, there was no indication that the father had manipulated income for the purposes of avoiding child

support, and the father did not have the ability to control the distribution of corporate assets. The court found that there was substantial competent evidence to support the trial court's decision not to consider retained earnings and distributions in calculating the father's support obligation.

Other courts that have not included subchapter S corporation earnings in a parent's income for child support purposes have focused on the need to calculate child support from income actually received and on the minority shareholder's lack of adequate control over the distribution of corporate dividends. See, *Taylor v. Taylor*, 118 N.C. App. 356, 455 S.E.2d 442 (1995) (holding trial court should give proper consideration to income parent actually receives and parent's subsequent ability to pay child support), *reversed on other grounds* 343 N.C. 50, 468 S.E.2d 33 (1996); *Riepenhoff v. Riepenhoff*, 64 Ohio App. 3d 135, 580 N.E.2d 846 (1990) (refusing to consider retained corporate earnings of subchapter S corporation as income for child support purposes because father lacked control over distribution of dividends, and no attempt by father to shelter retained earnings in effort to reduce child support obligation); *Fennell v. Fennell*, 753 A.2d 866 (Pa. Super. 2000) (finding father's proportional share of retained earnings of subchapter S corporation not income for child support purposes where father was minority shareholder unable to control whether business' net profits would be retained or distributed).

Courts including subchapter S corporation earnings as income have done so in the case of sole shareholders with the right and ability to control corporate earnings and based upon definitions of income found in state statutes or child support guidelines. See, *Merrill v. Merrill*, 587 N.E.2d 188 (Ind. App. 1992) (noting under child support guidelines that gross income included income from any source other than means-tested public assistance programs, finding gross income could include income from operation of business, and holding earnings of pharmacy were directly attributable to father because earnings retained by pharmacy represented its profits); *Reffeitt v. Reffeitt*, 419 N.E.2d 999 (Ind. App. 1981) (holding that trial court could impute subchapter S corporation earnings to father as long as his ownership interest of travel agency was considered financial resource based

upon definition of "financial resources" used in state code, which court found to be broader than term "net income"); *Hertz v. Hertz,* 304 Minn. 144, 229 N.W.2d 42 (1975) (counting subchapter S corporation earnings as personal income for child support purposes where father failed to prove amount of revenue needed for business capital); *Roth v. Roth,* 406 N.W.2d 77 (Minn. App. 1987) (imputing corporate earnings to father after deducting sums for business capital purposes where father was sole shareholder of subchapter S corporation that was father's only source of income); *Smith v. Smith,* 197 A.D.2d 830, 602 N.Y.S.2d 963 (1993) (imputing subchapter S corporation earnings as personal income based on definition of income under state child support act).

Paragraph D of the Nebraska Child Support Guidelines currently defines total monthly income as follows:

> This is income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages. This would include income that could be acquired by the parties through reasonable efforts. For instance, a court may consider as income the retained earnings in a closely-held corporation of which a party is a shareholder if the earnings appear excessive or inappropriate. . . .
>
> The court may consider overtime wages in determining child support if the overtime is a regular part of the employment and the employee can actually expect to regularly earn a certain amount of income from working overtime. . . .
>
> . . . .
>
> If applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources.

In *Noonan v. Noonan,* 261 Neb. 552, 624 N.W.2d 314 (2001), the Nebraska Supreme Court considered whether a father's overtime wages and capital gains income should be included in his income for purposes of calculating child support. The court stated:

> [I]f the evidence shows that a party actually earns or can reasonably expect to earn a certain amount of income on a regular basis, it is appropriate to consider such income in calculating child support. Paragraph D of the [Nebraska Child Support] Guidelines, which requires all sources of income to be included in calculating child support, requires such a rule. Therefore, if the moving party shows that the nonmoving party earns or can reasonably expect to earn a certain amount of income on a regular basis, a rebuttable presumption of including such income arises under the [Nebraska Child Support] Guidelines.
>
> After the moving party has met its burden of proof, the nonmoving party must produce sufficient evidence to rebut the presumption that the application of the [Nebraska Child Support] Guidelines will result in a fair and equitable child support order before deviation from the [Nebraska Child Support] Guidelines is appropriate. [Citations omitted.] Thus, if the nonmoving party can show that the included income is speculative in nature and over which the person has little or no control, *Stuczynski v. Stuczynski,* [238 Neb. 368, 471 N.W.2d 122 (1991)], the presumption of including the income is rebutted and it shall be excluded from the calculation.

*Noonan v. Noonan*, 261 Neb. at 560-61, 624 N.W.2d at 322-23.

In the instant case, Michael was the party requesting a modification of the parties' previous child support arrangement whereby they paid for the children's expenses out of a joint checking account to which they each contributed money. Given the overwhelming evidence that this arrangement was not workable, it is clear that a modification was warranted and that it was necessary for the district court to determine the child support utilizing the child support guidelines. Since Michael was seeking an award of child support from Stacy, he had the burden to show the income that Stacy earns or can reasonably expect to earn on a regular basis. See *Noonan v. Noonan, supra.* Michael relied on Stacy's tax returns for the years 1998 through 2000 to establish her income and submitted additional information concerning deposits into Stacy's checking account in 2000. Stacy attempted to rebut the presumption that the

passive income from Streck Labs and the family partnership should be included by adducing evidence that she did not actually receive the sums listed as passive income on her tax returns, but, rather, only received money from these entities to cover her estimated income taxes. The record does not contain any corporate or partnership tax returns or any documentation concerning money actually received by Stacy from these entities. However, Stacy's federal income tax returns show the amount of estimated payments she made during the years 1998, 1999, and 2000, which amounts were $40,601, $46,323, and $31,741, respectively. The record does not contain Stacy's state income tax returns for these years, but there clearly would have been estimated payments for state income taxes as well. The funds used by Stacy to pay these estimated taxes came from Streck Labs and the family partnership. While Stacy admitted that she received a distribution of $90,000 from Streck Labs shortly after the decree was entered in 1997, we do not have evidence of any other distributions from Streck Labs or the family partnership during 1998 through 2000, aside from the contributions toward Stacy's tax liability. Stacy also testified that she has no control over the distributions from these entities.

Given the record before us, we cannot say that the passive income identified on schedule E of Stacy's tax returns for the years 1998 through 2000 represents income that Stacy earns or can reasonably expect to earn on a regular basis. Neither do we have evidence of the retained earnings, if any, in Streck Labs, nor evidence that any such earnings were excessive or inappropriate. Therefore, we conclude that under the facts of this case, it was error for the district court to include the passive income, or loss, from Streck Labs and the family partnership in computing Stacy's income. However, we conclude that it is appropriate to include in Stacy's income the amounts of $40,601, $46,323, and $31,741 that these entities paid to Stacy to assist her in making her estimated tax payments, as identified on Stacy's federal income tax returns for 1998, 1999, and 2000, respectively. Thus, we are essentially excluding the passive income in excess of the amount Stacy actually received as identified above to be in the amount of her estimated tax payments.

### (b) Income Averaging

Stacy argues that the district court erred in averaging her income for the 3 years prior to this action. The Nebraska Child Support Guidelines provide that in the event of substantial fluctuations of annual earnings of either party during the immediate past 3 years, the income may be averaged to determine the amount of child support owed by each parent. *Halouska v. Halouska*, 7 Neb. App. 730, 585 N.W.2d 490 (1998). See, Nebraska Child Support Guidelines, worksheet 1 (fifth footnote); *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002). Stacy's adjusted gross income was $150,627, $170,326, and $55,954 for 1998, 1999, and 2000, respectively. The district court averaged these figures in calculating Stacy's child support obligation, due to its finding that Stacy's income for 2000 constituted a large variance from her income for the previous 2 years. We note that the court calculated Michael's income on his average "non-earned income" for 1998, 1999, and 2000, together with his actual earned income at the time of the decree.

Stacy's wages from her employment was $12,999 for 1998, $21,650 for 1999, and $18,112 for 2000. Stacy's employment contract ended in late April 2001, and she had not obtained another contract at the time of the modification trial. Stacy testified that her parents were willing to help her financially if she had custody of the children, but she also indicated that if she did not have custody of the children during the week, she might obtain full-time employment. There is nothing in the record to suggest that Stacy would be unable to obtain further employment in the field of pharmaceutical sales or in some other field, based upon her sales experience.

Although we have concluded that Stacy's passive income for the 3 years in question should be excluded in computing her income, the distributions she received for purposes of paying her estimated tax liability, which we do include in her income, also varied rather significantly, such that averaging those payments is appropriate. Based upon the substantial fluctuations of Stacy's annual income from her employment and distributions noted above during the 3 years prior to the modification proceedings, we conclude that the district court did not abuse its discretion in

averaging Stacy's income for the years 1998 through 2000 in determining her child support obligation.

### (c) Gifts Received From Parents

Stacy argues that it is highly inequitable to include as income for child support purposes the monetary gifts from her parents for the children, which gifts are deposited into Stacy's accounts. Evidence was adduced to show that Stacy received significant monetary gifts from her parents for herself and the children, including approximately $80,000 in the year 2000, which gifts were not reported as income. The district court did not include these gifts in its calculation of child support, but, rather, it simply averaged the adjusted gross income figures from Stacy's last three tax returns, from 1998 through 2000, as indicated above. This argument is without merit.

### (d) Alimony

In utilizing Stacy's adjusted gross income for the years 1998 through 2000, the district court included the income Stacy received as alimony for those 3 years, which was $12,000 for each of the years 1998 and 1999 and $7,000 for the year 2000.

The Nebraska Child Support Guidelines provide in paragraph M with regard to alimony that "[t]hese guidelines intend that spousal support be determined from income available to the parties after child support has been established." This court has interpreted paragraph M to mean that alimony paid to the noncustodial parent by the custodial parent is not income for purposes of calculating the child support obligation of the noncustodial parent. *Kelly v. Kelly*, 2 Neb. App. 399, 510 N.W.2d 90 (1993), *reversed on other grounds* 246 Neb. 55, 516 N.W.2d 612 (1994). The Nebraska Supreme Court recently considered a similar issue in *Gallner v. Hoffman*, 264 Neb. 995, 653 N.W.2d 838 (2002). The *Gallner* court concluded that the district court erred as a matter of law by including the mother's prior receipt of alimony in its consideration of the mother's income in a modification proceeding. The court held that because alimony is not properly considered as income when child support is established, the cessation of alimony cannot be considered a diminution in income when determining whether there has been a material

change of circumstances justifying a modification of child support. *Id.* Accordingly, in the present case, we conclude that in calculating Stacy's child support obligation, the district court erred in considering the alimony income which was received by Stacy and was included in her adjusted gross income.

### (e) Conclusion Regarding Child Support

Based upon our de novo review of the record in this case, we conclude that the district court erred in including the passive income reflected on schedule E of Stacy's federal income tax returns and the alimony she received for the years 1998 through 2000 in Stacy's income for purposes of setting child support. The district court did not include the monetary gifts that Stacy received from her parents as income and, accordingly, committed no error in this regard. Finally, the district court did not err in averaging Stacy's income for the years 1998, 1999, and 2000. We remand this matter to the district court for the purpose of recalculating Stacy's income and the resulting child support, based upon the record previously made, with directions to exclude from Stacy's adjusted gross income the schedule E passive income and alimony, but to include the amount of estimated tax payments found in Stacy's federal income tax returns.

### 5. CONTROL OF CHILDREN'S ACCOUNTS

Stacy and Michael had established two accounts for the minor children, which accounts totaled approximately $55,000 at the time of the divorce. The decree provided that the ownership of the accounts would remain in their "current form," that the primary purpose of the accounts was for the children's college education, but that the accounts could be used for extraordinary medical expenses or parochial high school tuition expenses in the event the parties did not have sufficient assets or income to contribute to those expenses themselves. The decree does not specify what the "current form" of the ownership of these accounts was, but Stacy testified in the present matter that the children's Putnam Investments account had been under her control since the decree and that Michael has maintained a Saloman Smith Barney account for the children's college education. Stacy is trustee of the Putnam Investments account for the children. The order of modification provided that Michael shall have control of all of

the children's accounts and that Stacy shall execute any necessary documents to transfer her control to Michael.

Stacy asserts that the district court erred in ordering her to give Michael property previously distributed to her in the decree of dissolution. Stacy also argues that neither of the parties sought any change in the ownership of the children's accounts in their respective applications to modify.

We disagree with Stacy's assertion that the control of these accounts was not placed at issue by her petition to modify and Michael's cross-petition. The control of these accounts, as provided for in the decree, was closely related to the joint custody arrangement and child support provisions therein, as opposed to being part of the distribution of real and personal property. By the parties' petitions to modify, the parties placed the custody and support of their children as issues before the trial court. Given that the trial court awarded custody of the children to Michael, we find no error in the portion of the order of modification granting Michael control of the children's accounts.

### 6. Orders With Regard to Sealing File

Stacy asserts that the district court erred in entering orders, one ex parte, "sealing" the file in this case and preventing only Stacy from disseminating pleadings and information. We note that although the court's initial ex parte order in this regard was directed at Stacy and her attorneys, that ex parte order was vacated following a hearing, and the court entered a second order that was applicable to both parties. This second order allowed access to the court file by the parties in the presence of the clerk without the file being checked out, in order to control the physical dissemination of the documents contained therein to nonparties. Finally, we note that in the order of modification filed on December 12, 2001, the district court included a provision which vacated its previous order sealing the file and released the clerk from any further responsibility to keep the file sealed.

Because the district court's second order controlling access to the file was vacated by the order of modification, we are unable to grant Stacy any effective relief with regard to the issues involved in this assignment of error, and thus conclude that these issues are moot. See *Koenig v. Southeast Community*

*College*, 231 Neb. 923, 438 N.W.2d 791 (1989), and *Henderson v. School Dist. of Scottsbluff*, 184 Neb. 858, 173 N.W.2d 32 (1969) (both invoking mootness doctrine due to inability of court to grant effective relief). A moot case is one which seeks to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive. *Chambers v. Lautenbaugh*, 263 Neb. 920, 644 N.W.2d 540 (2002). Stacy's assignment of error is moot.

## 7. MICHAEL'S ATTORNEY FEES

In Michael's cross-appeal, he first asserts that the district court erred in failing to require Stacy to compensate him in full for the attorney fees and costs he incurred in defending this action. In the order of modification, the district court ordered Michael and Stacy to each pay their own court costs and attorney fees; however, the district court ordered Stacy to pay Michael $2,500 for attorney fees incurred by him for the hearing on the motions to disqualify Michael's counsel and the GAL, which motions were filed and then withdrawn by Stacy in this matter.

There is no rule that requires the trial court to necessarily award attorney fees in accordance with the value of services in a divorce case. *Whitney v. Whitney*, 214 Neb. 565, 334 N.W.2d 799 (1983). The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. *Bowers v. Lens*, 264 Neb. 465, 648 N.W.2d 294 (2002).

At trial, the district court received exhibit 208, which includes an affidavit of Michael's counsel showing that the total attorney fees and costs incurred by Michael in this matter through the date of the affidavit were $87,276.85. Evidence was adduced by an Omaha attorney specializing in family law that the charges by Michael's counsel were "fair and reasonable based on the standards in Omaha, Douglas County, Nebraska." Evidence adduced by Stacy indicated that she had obtained money from her parents for fees, because she did not have the funds to pay for the modification suit, and that at the time of the modification trial, she owed $200,000 on this loan from her parents.

The record before us on appeal is extensive. It contains eight volumes of testimony, a box of over 160 exhibits, and a transcript several inches thick. The record covers the proceedings during the 5 days of trial as well as hearings on various motions held on six additional dates. Clearly, this was a complex case, given the number of allegations raised in both the petition to modify and the cross-petition. Having conducted a de novo review of the record, we cannot say that the district court erred in ordering each party to be responsible for his or her own attorney fees with the above-indicated exception.

Michael argues that Stacy's action was frivolous and that she or her attorneys should be assessed attorney fees and costs. Neb. Rev. Stat. § 25-824(2) (Reissue 1995) provides in relevant part:

[I]n any civil action commenced or appealed in any court of record in this state, the court shall award as part of its judgment and in addition to any other costs otherwise assessed reasonable attorney's fees and court costs against any attorney or party who has brought or defended a civil action that alleges a claim or defense which a court determines is frivolous or made in bad faith.

While Stacy's petition was considerably more lengthy than necessary, the general tenet of her petition was that the joint custody arrangement was not working and that she should be given sole custody of the parties' children. Although Stacy did not prevail on her request for sole custody, there was clearly a change in circumstances requiring a change from the joint custody awarded in the decree of dissolution. Further, Michael also requested relief from the court and was successful in obtaining custody of the children. Accordingly, we cannot say that Stacy's petition was frivolous or made in bad faith. Michael's assertions to the contrary are without merit.

### 8. FEES AND COSTS FOR GAL AND GAL'S ATTORNEY

Finally, Michael asserts that the district court erred in dividing the fees and costs for the GAL and the GAL's attorney equally between the parties. Michael does not question the amount of fees incurred by the GAL and the GAL's attorney, only the division of the fees equally between the parties. Michael filed a motion for appointment of a GAL in this case, which motion was

subsequently granted by the district court. In carrying out the GAL's duties, the GAL reviewed pleadings and discovery documents, correspondence between the parties, certain depositions, the children's grade reports, various psychological reports, tax returns, and bank statements. The GAL also interviewed two of the children's counselors and met with Michael, Stacy, and the children on multiple occasions. The GAL was present throughout the 5-day trial and testified at length concerning the GAL's investigation. Subsequent to the GAL's appointment by the court, the GAL filed a motion for appointment of attorney for GAL, which motion was granted by the court. The GAL was represented by this attorney during the course of trial, and the GAL's attorney questioned witnesses on behalf of the GAL. The GAL's attorney submitted an application requesting an award of fees for the GAL totaling $23,226.63 and fees for the GAL's attorney totaling $8,157.63. In an order filed January 7, 2001, the district court overruled Stacy's objections to the fee application and granted the applications in the amounts indicated above.

The time and effort expended by the GAL and the GAL's attorney in this matter was necessary, in part, because of the contentious relationship between the parties and the allegations by both parties in their pleadings. Further, the best interests of the children required a thorough investigation by the GAL. Upon our de novo review of the record, we cannot say that ordering the parties to equally divide the fees and costs for the GAL and the GAL's attorney is untenable and unfairly deprives either party of a substantial right or a just result.

## VI. CONCLUSION

Based upon our review of the record and the various statutory and case law factors, we cannot say that the trial court abused its discretion in finding that a material change in circumstances had occurred and in awarding custody of the parties' children to Michael. Assuming without deciding that some of the GAL's testimony may contain evidence that is inadmissible, we have disregarded such evidence in our de novo review of the record. We further find that the district court did not err in denying the parties' motions for rule 35 custody evaluations or in denying

Stacy's motion for an alcohol evaluation. The district court did not abuse its discretion in setting visitation.

The district court erred in including in Stacy's income for purposes of setting child support the passive income reflected on schedule E of Stacy's federal income tax returns and the alimony she received for the years 1998 through 2000. The district court did not include the monetary gifts that Stacy received from her parents as income and, accordingly, committed no error in this regard. The district court did not err in averaging Stacy's income for the years 1998, 1999, and 2000. We remand this matter to the district court for the purpose of recalculating Stacy's income and the resulting child support as stated herein. The district court did not err in granting Michael control of the children's college education accounts.

With regard to the court's orders "sealing" the file in this case, we find that this issue was mooted by a provision in the order of modification, which provision vacated those previous orders. The district court did not abuse its discretion with regard to the award of attorney fees to Michael or in the award of fees to the GAL and the GAL's attorney.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.