IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF CARSON H. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF CARSON H. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

LEROY H., APPELLANT.

Filed December 7, 2021.    Nos. A-21-378, A-21-380 through A-21-382.

Appeals  from the County Court for Valley County: KALE B. BURDICK, Judge. Affirmed.

Michael S. Borders, of Borders Law Office, for appellant.

Kayla C. Haberstick, Special Valley County Attorney, for appellee.

Gary G. Peterson, guardian ad litem.

MOORE, BISHOP, and ARTERBURN, Judges.

MOORE, Judge.

## INTRODUCTION

LeRoy H. appeals the termination of his parental rights to his minor children. LeRoy contends that the county court for Valley County, sitting as a juvenile court, erred in admitting certain evidence in violation of his due process rights and finding that he was unfit to parent his children and that termination of his parental rights was in the children's best interests. For the reasons set forth herein, we affirm.

- 1 -

STATEMENT OF FACTS

LeRoy and Tonya H. are the parents of four minor children born in 2005, 2006, 2009, and 2011 (collectively the children), who are the children in the present case to whom LeRoy's parental rights were terminated. LeRoy is also the parent of an older child, who is no longer a minor and not part of the present case. LeRoy and Tonya have an extensive history of working with the Nebraska Department of Health and Human Services (the Department). Between January 2006 and June 2017, they had 12 intakes to the Child Abuse and Neglect Hotline. Of those 12 intakes, 9 were unfounded, 2 were court substantiated, and 1 was agency substantiated. Concerns alleged in those previous intakes included unsanitary living conditions, the family living with a registered sex offender, not providing for the children's basic needs, domestic violence, substance use, and failure to protect the children from harm caused by their older half sibling. The family worked ongoing services with the Department on two prior occasions: first, from June through November 2012; and second, from March through July 2014. On both of those occasions, the four children involved in the present case were removed from LeRoy and Tonya's care and placed outside of the home for a period. LeRoy and Tonya also worked with the Department in a case involving LeRoy's oldest child from July 2009 until November 2014 when that child aged out of the juvenile court system. LeRoy's oldest child was removed from LeRoy's care and adjudicated due to inappropriate sexual behaviors involving the oldest of the four younger children; LeRoy's oldest child was also sexually inappropriate with another one of the younger children while at a visit with family.

Following a welfare check on March 28, 2019, due to allegations of unsanitary living conditions, the children were removed from LeRoy and Tonya's care in the present case. While those allegations were being investigated, the younger children made disclosures that the oldest of the four children had been having sex with the youngest child. There were also allegations that the oldest child had been sexually inappropriate with the other two younger children, that LeRoy had been sexually inappropriate with the youngest child, and that Tonya was aware of these issues but did not act to protect the children. Criminal charges were filed and both parents spent time in jail as a result of the allegations in this case. Tonya is not involved in the present appeal (she was continuing to work toward reunification with the children at the time of the hearing on the motion to terminate LeRoy's parental rights); we have referenced her further only as necessary to the resolution of LeRoy's appeal.

On March 29, 2019, the State filed petitions alleging the children were juveniles within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) due to the fault or habits of their parents. On that same date, the juvenile court entered orders placing the children in the temporary custody of the Department. The children have not returned to the care of either LeRoy or Tonya since their removal in March.

On September 13, 2019, Tonya entered no contest admissions to the allegations of the petitions in each case and the children were adjudicated as juveniles within the meaning of § 43-247(3)(a). Following a dispositional hearing in October, the court ordered the parties to comply with the terms of the case plan prepared by the Department, but specified that the plan was applicable only to Tonya as there had been no adjudication of the children as to LeRoy. The court ordered Tonya to complete chemical dependency and psychological evaluations and authorized

therapeutic visits to begin between Tonya and the children when approved by the children's respective therapists.

On February 26, 2020, LeRoy entered no contest admissions to the allegations of the petitions in each case, and the juvenile court again adjudicated the children as juveniles within the meaning of § 43-27(3)(a).

The Department subsequently prepared a case plan and court report dated April 3, 2020, pertaining to LeRoy. The case plan included two goals. First, LeRoy was to "ensure the safety and well-being of his children . . . by providing a safe and secure home environment." Strategies relating to the first goal were that LeRoy would obtain and maintain employment and appropriate housing and refrain from associating with individuals that may cause physical and emotional harm to the children. Under the second goal, LeRoy was to "ensure the safety and well-being of his children . . . by making sure that the children are not sexually exploited in any way." Strategies for achieving the second goal were to ensure that the children were not inappropriately touching their siblings, that LeRoy would refrain from inappropriately touching the children, that he would work with therapeutic services to address the children's mental health needs, and again that he would refrain from associating with individuals that may cause the children physical and emotional harm. The progress notes for the second goal in the April 2020 case plan stated, "It has been recommended by [C.H.'s] therapist that [LeRoy] complete a psychological evaluation, participate in an anger management program, and attend individual therapy."

On May 6, 2020, LeRoy filed an objection to the April 2020 case plan and court report. Specifically, LeRoy objected to being required to complete a psychological evaluation, participate in anger management, and attend individual therapy. He generally agreed with the other recommendations of the case plan.

The record on appeal does not include a bill of exceptions for any hearings relating to LeRoy occurring in May 2020 or any resulting orders or journal entries, but the juvenile court's order terminating LeRoy's parental rights indicates that a dispositional hearing was held on May 27, 2020, and that LeRoy's objections to the April 2020 case plan and court report were heard at that time. The termination order indicates that following the dispositional hearing, the court modified the case plan to require LeRoy to submit to a psychological evaluation only; it did not require him to participate in an anger management program or individual counseling until a psychological evaluation was completed. According to the termination order, the court approved and adopted the case plan and court report as modified, ordered the parties to comply with the modified case plan and court report, specifically ordered LeRoy to submit to a psychological evaluation, and advised LeRoy that he was to have no contact with the children until a psychological evaluation was completed. The termination order also indicates that there were court-ordered restrictions in place prohibiting LeRoy's contact with the children in the criminal case against him, but the details of any such restrictions in the criminal case are not included in our record.

On August 26, 2020, a review and exception hearing was held with regard to LeRoy. The juvenile court approved and adopted the Department's case plan and court report dated August 5, overruled LeRoy's objections to that case plan, and ordered him to comply with its provisions. The goals and strategies of the August 2020 case plan for LeRoy were unchanged from those of the previous case plan. The court found that an exception to the filing of a petition to terminate

LeRoy's parental rights based on the children's placement outside the home for more than 16 months existed under Neb. Rev. Stat. § 43-292.02(3)(c) (Cum. Supp. 2020) (family of juvenile has not had reasonable opportunity to avail themselves of services deemed necessary in case or permanency plan approved by court). The court advised LeRoy, however, that the finding of an exception was temporary and that he must progress in compliance with the case plan or an exception would no longer exist. The court reiterated its previous order for LeRoy to submit to a psychological evaluation and advised him that "failure to submit to such court-ordered evaluation will have negative consequences."

Another review and exception hearing was held on November 25, 2020. At that time, the juvenile court approved and adopted the Department's case plan and court report dated November 4, 2020, in which the case plan goals and strategies remained the same as those in previous case plans pertaining to LeRoy. During the hearing, LeRoy again objected to the case plan requirement that he complete a psychological evaluation. In overruling LeRoy's objection, the juvenile court noted that in May, it had modified the case plan to remove any requirement that LeRoy complete anger management or participate in individual therapy until after completing a psychological evaluation and that it had warned him in August that he still needed to complete a psychological evaluation and that the failure to submit to an evaluation would have consequences. The court also found that an exception to the filing of a petition to terminate LeRoy's parental rights no longer existed. At the hearing, the court observed that "the only real ground for the [previous] exception was the children's mother was granted an exception and [the Department] wanted [LeRoy] to have the same opportunity to engage in services as the children's mother had." The court stated further, "Other than being employed and having a home, which [the Department] has not been able to verify because [LeRoy] will not cooperate with [the Department], there has been no progress whatsoever." The court then ordered the State to file a petition to terminate LeRoy's parental rights pursuant to § 43-292.02(1)(a) (petition to terminate shall be filed if juvenile has been in foster care for 15 or more months of most recent 22 months).

On March 10, 2021, the State filed motions to terminate LeRoy's parental rights. The State alleged that statutory grounds existed for termination of his parental rights under Neb. Rev. Stat. § 43-292 (2), (3), (4), (6), (7), and (9) (Reissue 2016).

A termination of parental rights hearing was held before the juvenile court on April 19, 2021. LeRoy did not appear for the trial, and the court overruled his attorney's motion to continue because the record showed that LeRoy had been served with notice of the hearing. The court received exhibits offered by the State over objections made by LeRoy's attorney. The exhibits included Department case plans, court reports, and update letters from October 2019 through February 2021 (pertaining to both Tonya and LeRoy); letters from the therapists for some of the children; a caregiver information sheet from the foster parent for some of the children (admitted in the cases involving those children); and a Foster Care Review Board report dated January 21, 2021. LeRoy's attorney indicated he had foundation and hearsay objections; that he had those objections "strongly" in relation to the caregiver information form, the therapist letters, and the Foster Care Review Board report; and that "any case plan and court report is full of hearsay and full [sic] of foundation where the information came from." He also argued that with respect to "the ones where some sort of counselor or psychotherapist for foster care or anybody is trying to testify," he had "no chance of cross examination on any of those." In overruling LeRoy's

- 4 -

objections, the court noted that with regard to the caregiver information sheet and the therapist letters, the court would "give those appropriate weight and consideration . . . taking into account whether . . . the people that authored those are witnesses for trial." After further argument from LeRoy's attorney, the court indicated that it "would make that same consideration with regard to the Foster Care Review Board." The State also presented testimony from Angela Brown, the Department caseworker for the family since May 2019. We summarize her testimony below.

Brown testified that as part of her duties in this case, she had prepared case plans and court reports containing specific goals and objectives for LeRoy. Brown testified that she had not seen any progress by LeRoy toward those goals and objectives, noting that at the time of her testimony, she had not spoken to him for several months. Brown explained that she had attempted to contact LeRoy in that period by calling, sending text messages, and going to his place of employment, but that he would not meet with her. Brown had not been able to complete a home visit of LeRoy's residence and LeRoy had not completed a psychological evaluation, which had prevented him from being able to begin therapeutic visits with the children. She affirmed that LeRoy has not had any contact with the children during the pendency of this case due to the "no contact order that has not yet been modified between him and his children" and that in order to have contact with the children, LeRoy needed to complete a psychological evaluation. At the time of Brown's testimony, the Department's permanency objective for the children remained reunification "[w]ith a parent who completes all of their case plan goals."

Brown was cross-examined by the children's guardian ad litem. During that questioning, Brown was asked about circumstances leading to the recommendation for a psychological evaluation of LeRoy. Brown testified that she speaks with the children once a month at minimum. When asked whether the children have expressed any concerns to her about things that occurred in the family home or might involve LeRoy, she stated that the children have very little conversation with her about LeRoy because "they will not speak about him at all." LeRoy's attorney did not object to any of this questioning.

Brown also testified that she has had contact with the children's therapists during this case and that they have raised concerns about LeRoy's behavior. When the guardian ad litem asked Brown what those concerns were, LeRoy's attorney objected on the bases of hearsay and foundation, which objection was overruled. Brown then testified that the therapists for three of the children have indicated that the children have disclosed incidents of physical abuse, that one child disclosed incidents of sexual abuse perpetrated upon that child by LeRoy, and "[a] great deal of verbal abuse as well." Brown was asked about any communications she might have had about the fourth child, to which Brown replied, that her conversations with that child's most recent therapist indicate that child "has not disclosed any specifics but has no real desire to have contact with [LeRoy] at all." Brown testified that she had been able to review an evaluation of that particular child, which had no specifics about LeRoy. She also testified that in speaking with that child at the beginning of this case, the child had been "very steadfast" in defending LeRoy, but after more time passed and the child had been able to "process with [the] therapist," the child had "kind of turned to more of a[n] I don't care attitude."

The guardian ad litem inquired how long it had been since Brown had had any conversations with LeRoy. Brown indicated that her last verbal conversation with him occurred in September 2020, at which time LeRoy told her he was not going to complete the ordered

psychological evaluation and that was the extent of what LeRoy had to say to her then. Brown testified that before August 2020, she had fairly regular contact with LeRoy, during which he indicated that he did not feel he had done anything wrong, that he felt a lack of support from Brown because she would not ask the court to overturn the no contact order, and that he felt "everybody was just out to get him and destroy his family." Brown detailed a meeting between herself, the guardian ad litem, and LeRoy in the fall of 2019 which factored into the Department's request for the psychological evaluation. Following the meeting, Brown had concerns relating to LeRoy's discussion of his alcohol consumption and statements he made in reference to one of his children not involved in this case. Additionally, she testified, without objection, that the request for the psychological evaluation was also prompted by recommendations from some of the children's therapists.

Brown testified about her efforts in providing assistance to set up the psychological evaluation, which efforts she attempted to communicate to LeRoy. She contacted the service provider, which advised her that the Department would need to confirm its agreement to pay for the evaluation and that LeRoy would also need to complete certain paperwork before an appointment could be scheduled. Brown made arrangements to authorize payment for the evaluation. She then hand delivered the paperwork to LeRoy at his place of employment, in addition to mailing it to him on two separate occasions and also emailing it to his attorney. The email, sent near the end of June 2020, did not lead to any response from LeRoy, but Brown testified that she spoke to him following the May 2020 court hearing, at which time he told her "he wasn't going to go unless [she] scheduled visits with his kids prior to him attending that appointment." Brown confirmed that as of the date of her testimony, LeRoy had made no effort to participate in the psychological evaluation. She also testified, without objection, that none of the therapists had changed their position with regard to allowing LeRoy to have contact with the children without an evaluation.

The guardian ad litem then asked whether Brown had made any determinations with regard to the children's best interests and the termination of LeRoy's parental rights. Brown testified that she believed it was in the children's best interests to not have contact with LeRoy "at this time," and she confirmed that they had not had contact with LeRoy during the course of this case. Brown expressed her belief that that the children needed to begin contact with LeRoy in a therapeutic setting where they could "feel comfortable in expressing their feelings and frustrations with him." Brown also testified about LeRoy's compliance with other components of the case plan. She indicated that she had not been able to verify LeRoy's assertion that he had acquired stable housing because he has not told her where he resides. Brown was, however, able to verify that LeRoy had secured employment. According to Brown, she contacted LeRoy at least once a month and sometimes more to attempt to get him to participate in the case plan, and she expressed to him multiple times the need to participate in order to see his children. She again indicated that LeRoy has told her verbally he will not do so.

Brown was also cross-examined by LeRoy's attorney. During this questioning, she confirmed that LeRoy "was immediately arrested when this whole matter started," that he was in jail for quite some time and unable to obtain housing or employment during that period, and that she had subsequently verified his employment but had been unable to verify his housing. According to Brown, LeRoy sent a text message telling her he had moved into a three-bedroom

house. Although she inquired about the house's location, LeRoy would not provide her with an address. She confirmed that she had written all of the case plans and court reports to date in this case, that one component is the requirement for LeRoy to complete a psychological evaluation, and that his failure to complete this requirement is what has prevented him from having visits with the children. When LeRoy's attorney asked Brown whether it was possible to have visitation in a therapeutic setting without the completion of a psychological evaluation, she agreed that "[i]t is possible." Upon further questioning about whether a therapeutic visit could have occurred "as long as the children felt they were in a safe place," Brown responded, "The children's therapists do not believe it's in their best interests to participate in that unless they had some information about [LeRoy's] state of mind." LeRoy's attorney also inquired whether Brown tried to arrange any visitation for LeRoy prior to the no contact order of May 2020. Brown indicated that she was making attempts through the children's therapists to determine what they felt would be necessary to be able to do visits.

After Brown's testimony, the State rested. LeRoy then rested without presenting any further evidence beyond his cross-examination of Brown.

On April 4, 2021, the juvenile court entered orders terminating LeRoy's parental rights to the children. The court found that the State had not presented any evidence to support termination under § 43-292(3), (4), or (9), so the court did not consider those grounds for termination. However, the court found sufficient evidence to support termination of LeRoy's parental rights under § 43-292(2), (6), and (7). The court also found that LeRoy was unfit to parent the children and that termination of his parental rights was in the children's best interests.

## ASSIGNMENTS OF ERROR

LeRoy asserts, consolidated and restated, that the juvenile court erred in (1) admitting exhibits which contained hearsay and allowing Brown to testify to hearsay in violation of his due process rights and (2) finding that he was unfit to parent his children and that termination of his parental rights was in their best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

*Admission of Evidence.*

LeRoy first asserts that the juvenile court erred in admitting exhibits which contained hearsay and allowing Brown to testify to hearsay in violation of his due process rights to confront and cross-examine witnesses.

LeRoy challenges the admission of the case plans and court reports, as well as a Department update letter, the therapist letters, the caregiver information sheet admitted in two of the cases, and the Foster Care Review Board report. He acknowledges that Brown authored the case plans and

court reports and the updated letter, but he argues that these exhibits, as well as the other exhibits, included hearsay from individuals who were not called to testify at trial and that the admission of all of these exhibits violated his due process rights, as well as his right to cross-examine witnesses.

The Nebraska Evidence Rules do not apply in cases involving the termination of parental rights. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Instead, due process controls and requires that the State use fundamentally fair procedures before a court terminates parental rights. *Id.* In determining whether admission or exclusion of particular evidence would violate fundamental due process, the Nebraska Evidence Rules serve as a guidepost. *In re Interest of Becka P. et al., supra.*

Rather than the formal rules of evidence, an appellate court evaluates the admission of evidence in termination of parental rights cases using a due process analysis. *Id.* Procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker. *Id.*

In this case, although LeRoy did not appear at the termination hearing, he received proper notice of the hearing and he was represented by his counsel during the hearing. LeRoy was given a reasonable opportunity to refute or defend against the grounds alleged for termination of his parental rights and had a reasonable opportunity to confront and cross-examine adverse witnesses and present evidence in regard to the termination. Brown has been the caseworker since May 2019. The first case plan and court report admitted into evidence is from October 2019. She indicated in her testimony that she authored all of the case plans and court reports and the update letter admitted into evidence. She did not provide any testimony about how the case plans and court reports are used by the Department in juvenile court cases. Even if Brown's testimony did not provide sufficient foundation to admit these exhibits under the business records exception to the hearsay rule, as discussed further below in connection with the admission of the other exhibits, we do not find reversible error.

The other exhibits admitted at the termination hearing were not authored by Brown or any other person who testified at trial. Assuming without deciding that the admission of those exhibits, and the objectionable portions of the exhibits authored by Brown, was erroneous, we do not find that their admission constituted reversible error. LeRoy has failed to demonstrate how this evidence was prejudicial to his due process rights. The improper admission of evidence by a juvenile court in a parental rights termination proceeding does not, in and of itself, constitute reversible error; a showing of prejudice must be made. *In re Interest of Kindra S.*, 14 Neb. App. 202, 705 N.W.2d 792 (2005). And, even if we do not consider any of the objectionable evidence in the exhibits admitted at trial, there was sufficient evidence presented to warrant termination of LeRoy's parental rights. In a trial to the court, the presumption is that the trial court considered only such evidence as is competent and relevant, and the reviewing court will not reverse such a case because evidence was erroneously admitted where there is other material, competent, and relevant evidence sufficient to sustain the judgment. *Coffey v. Coffey*, 11 Neb. App. 788, 661 N.W.2d 327 (2003). See, also, *Sellers v. Sellers*, 23 Neb. App. 219, 869 N.W.2d 703 (2015) (upon

de novo review in appellate court, incompetent, irrelevant, and immaterial evidence offered in original trial, which was admitted over proper objections by adverse party, will be disregarded).

LeRoy also challenges the admission of Brown's testimony during questioning by the guardian ad litem about her communications with the children's therapists regarding disclosures made by the children. Some of the testimony referenced by LeRoy was not specifically objected to, and in his own cross-examination of Brown, LeRoy's attorney asked questions that elicited further testimony about the therapists' belief that a psychological evaluation of LeRoy is necessary before any therapeutic contact with the children. As with the admission of the exhibits, LeRoy has not shown how he was prejudiced by this testimony. Regardless of the reasons behind the recommendation for the psychological evaluation, the properly admitted evidence show that it was a court-ordered component of LeRoy's case plan requirements and that he failed to complete this requirement. Brown's testimony clearly shows that LeRoy failed to cooperate in the process of setting up and completing a psychological evaluation, allowing the Department to verify his housing, and in communicating with Brown about his case.

Because LeRoy cannot show prejudice in the admission of the complained of evidence and because there was clear and convincing evidence to justify termination of his parental rights disregarding any impermissible or improper evidence, LeRoy's first assignment of error fails.

*Statutory Grounds.*

To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Zachary D. & Alexander D.*, 289 Neb. 763, 857 N.W.2d 323 (2015).

In this case, the juvenile court found clear and convincing evidence of statutory grounds to terminate LeRoy's parental rights to the children under § 43-292(2), (6), and (7). LeRoy does not challenge the court's findings with respect to statutory grounds, but we address this issue briefly for the sake of completeness. Upon our de novo review, we find that the State presented clear and convincing evidence to support termination of LeRoy's parental rights under § 43-292(7). Proof of one statutory ground is needed for termination, and the record clearly shows that statutory grounds for termination of his parental rights exist under § 43-292(7).

Section 43-292(7) provides grounds for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*.

The children were removed from LeRoy's care following a welfare check on March 28, 2019, placed in the Department's custody on March 29, and have been in out-of-home placements continuously since that time. Motions to terminate LeRoy's parental rights were filed on March 10, 2021, at which time the children had been in out-of-home placement for more than 23 months, and by the start of the termination hearing on April 19, they had been in out-of-home placement for nearly 25 months. Our de novo review of the record clearly and convincingly shows that

grounds for termination of LeRoy's parental rights under § 43-292(7) were proven by sufficient evidence.

The juvenile court also found sufficient evidence to support termination under § 43-292(2) and (6), but we do not need to consider whether termination of LeRoy's parental rights was proper pursuant to those subsections since § 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). However, we will consider evidence relevant to § 43-292(2) and (6) in our analysis of best interests. Generally, when termination of parental rights is sought under subsections of § 43-292 other than subsection (7), the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of Mya C. et al.*, 23 Neb. App. 383, 872 N.W.2d 56 (2015).

*Best Interests and Unfitness.*

LeRoy asserts that the juvenile court erred in finding that he was unfit to parent his children and that termination of his parental rights was in their best interests.

In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Jahon S.,* 291 Neb. 97, 864 N.W.2d 228 (2015). Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). The best interests and parental unfitness analyses in the context of a termination of parental rights case require separate, fact-intensive inquiries, but each examines essentially the same underlying facts. *Id.*

In addressing unfitness, the juvenile court in this case stated, "Refusing to engage in therapeutic services so that [LeRoy] can have contact with his children in a manner that is conducive to the children's emotional and mental well-being makes LeRoy an unfit parent." With respect to best interests, the court found that the evidence showed a complete lack of effort on LeRoy's part. We agree with the court's assessment. Other than maintaining employment, LeRoy has done nothing to complete the court ordered plan of rehabilitation. His arguments to the contrary are based in his assertions that there is little evidence in the record to support the need for therapeutic contact between himself and the children absent additional testimony from the children's therapists. We have addressed his evidentiary arguments above. Even considering LeRoy's assertions that he should not be required to submit to a psychological evaluation because

he has done nothing wrong, it is clear from the circumstances that led to the children's removal in March 2019, they have been severely traumatized. Given the amount of time without contact between LeRoy and the children as well as the circumstances of their removal, a requirement that contact resume only in a therapeutic setting after some evaluation of LeRoy's ability to engage with the children in beneficial ways is a sensible requirement. Regardless of the origin of the recommendation that a psychological evaluation occur before the resumption of contact in a therapeutic setting, the fact remains that LeRoy has been court-ordered since the end of May 2020 to submit to a psychological evaluation in order to resume contact with his children. Since that time he has been repeatedly advised by both Brown and the court of that requirement, and he has consistently refused to comply. LeRoy did not appeal from the February 2020 adjudication order. He did file objections to the case plan offered at the adjudication hearing, but he did not then appeal from the May 2020 dispositional order adopting the initial case plan for him, which was a final appealable order. He cannot now collaterally attack the case plan that was adopted for him pursuant to the children's adjudication. See *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003) (dispositional order imposing rehabilitation plan for parents in juvenile case is final, appealable order; absent direct appeal from adjudication order, parent may not question existence of facts upon which juvenile court asserted jurisdiction).

In addition to LeRoy's refusal to comply with the requirement for a psychological evaluation, he has had minimal contact with Brown, despite her efforts in that regard. He has maintained employment, and although he reportedly has housing, he has not verified that housing with Brown or allowed her to assess its condition or suitability. In sum, we agree with the juvenile court's assessment that the evidence shows a complete lack of effort on LeRoy's part, even after being given additional time when the court approved an exception to the requirement to file a motion for termination of parental rights based on the amount of time the children had been in out-of-home placements. LeRoy has done nothing to place himself in a position to be reunited with his children during the course of this case. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). We conclude that the State showed by clear and convincing evidence that LeRoy was unfit and that termination of his parental rights was in the children's best interests.

## CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating LeRoy's parental rights to his minor children.

AFFIRMED.